IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH DENNIS LEWIS, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION No. H-14-0040 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent*. | § | |

**MEMORANDUM OPINION AND ORDER**

Joseph Dennis Lewis, a state inmate proceeding *pro se*, filed this section 2254 habeas petition challenging his conviction and life sentence for murder. Respondent filed a motion for summary judgment (Docket Entry No. 18), to which petitioner filed a response (Docket Entry No. 20).

Based on careful consideration of the pleadings, the motion, the response, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this case for the reasons that follow.

**I. BACKGROUND AND CLAIMS**

Petitioner was convicted of murder and sentenced to life imprisonment on May 3, 2007. The conviction was affirmed on appeal, *Lewis v. State*, C.A. No. 14-07-00377-CR, 2008 WL 2262069 (Tex. App.—Houston [14th Dist.] 2008, ref'd), and the Texas Court of Criminal Appeals refused discretionary review on October 13, 2010. Petitioner's application for state habeas relief was denied on September 11, 2013.

Petitioner filed the instant habeas petition raising the following grounds for relief:

1. There is no evidence to support the murder conviction.

2. There is insufficient evidence to support the murder conviction.

3. Trial counsel was ineffective in failing to object to an improper victim impact statement.

4. Trial counsel was ineffective in failing to impeach sufficiently the credibility of the State's witness.

Respondent argues that these claims are without merit and should be dismissed.

## II. THE APPLICABLE LEGAL STANDARDS

A. <u>Habeas Review</u>

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254. Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, ___U.S. ___, 131 S. Ct. 770, 785 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411.

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

B.  Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant

probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### III. SUFFICIENCY OF THE EVIDENCE

Petitioner challenges the sufficiency of the evidence to support his conviction. The intermediate state court of appeals set forth the following statement of facts in its opinion affirming petitioner's conviction:

> Michael Gutierrez and Robert Baker had been friends since childhood. Even after Baker moved from Houston to Florida, he and Gutierrez kept in contact. On one of his trips back to Houston, Baker met Clay Garretson. Approximately once a month, Baker would return to Houston, and he and Garretson would hang out together. Baker often told Garretson and his friends that he had a friend who could get them any kind of drug they wanted. Baker was referring to Gutierrez.
>
> In July 2005, Garretson met Shelton Strawder through a mutual friend. In August 2005, Garretson also met a close friend of Strawder's known as

'Cheese,' who was later identified as [Lewis]. Sometime around the middle of August 2005, Strawder asked Garretson to call Baker and get him hooked up with Baker's friend who could get him drugs. Garretson called Baker, and Baker put Garretson in contact with Gutierrez.

After Baker put Garretson and Gutierrez in contact, Strawder and [Lewis] met with Gutierrez to transact the drug deal. Strawder bought cocaine from Gutierrez with the intent of cooking it into crack. Gutierrez told Strawder the cocaine was raw, but when Strawder attempted to cook the cocaine in front of Gutierrez, he ruined it. Strawder became angry and did not want to pay Gutierrez for the ruined cocaine, but Gutierrez insisted he pay. Strawder reluctantly paid Gutierrez $500, but he called Garretson and demanded Garretson either pay him the $500 or call Baker and complain.

At Strawder's request, Garretson called Baker and told him the drugs Gutierrez sold were bad. Garretson told Baker that Strawder was upset, and he asked Baker to talk with Gutierrez. Baker told Garretson he would talk to Gutierrez, but according to Garretson, Gutierrez never made the situation right.

In the mean time, Strawder, his girlfriend, and his baby moved in with Garretson. Strawder did not pay rent, did not pay for food, and did not have a car. According to Garretson, they were originally only going to stay for a couple of weeks, but they always had an excuse as to why they could not move out. Eventually, Garretson began spending most of his time at his girlfriend's apartment, partially due to the cramped living conditions at his own apartment.

Sometime in February 2006, Strawder called Garretson and told him a friend needed eight ounces of cocaine. Garretson initially ignored Strawder's request, but Strawder called again about a week later and asked if Garretson could get the cocaine. Garretson did not really want to be a part of Strawder's drug deal, but he decided he would help Strawder because Strawder told Garretson he would use the money to get his own apartment.

On February 22, 2006, Garretson called Gutierrez and asked if he was interested in selling some cocaine. Gutierrez told Garretson he was out of town, but he would call Garretson when he arrived back in Houston. Garretson relayed the information to Strawder, but Garretson did not tell Strawder he was dealing with Gutierrez. At this point, Garretson knew Strawder wanted the cocaine for a friend, but Garretson did not know who the friend was. When Gutierrez arrived back in Houston, Garretson went to

5

Gutierrez's house and Gutierrez quoted a price. Garretson then informed Strawder of the price, which Strawder agreed to pay. Gutierrez told Garretson it would take him approximately an hour to get the cocaine, and he would call Garretson when he was ready.

After Gutierrez obtained the cocaine, the four men discussed arrangements for the exchange. Gutierrez originally suggested they all meet at Gutierrez's house, but Garretson did not want to make the exchange there because he did not want Strawder and his friend to know where Gutierrez lived. Instead, Gutierrez and Garretson decided to meet up at the Marq E Entertainment Complex off of Interstate-10. Garretson's plan was to meet Gutierrez and the two of them would meet Strawder and his friend at a different location. Garretson felt there would be too many people at the entertainment complex to make the exchange.

Garretson arrived at the complex approximately fifteen to twenty minutes before Gutierrez. While Garretson was waiting for Gutierrez, [Lewis] called him and asked Garretson if he could get sixteen ounces of cocaine instead of eight. Garretson was surprised when [Lewis] called him because, up until this point, he had only communicated with Strawder. According to Garretson, he would not have set up the deal if he would have known [Lewis] was involved. Garretson wanted to cancel the deal, but ultimately decided to go through with it. At this point, Garretson called Gutierrez and asked if he could get sixteen ounces instead of eight. Gutierrez told Garretson he could get twelve ounces, so Garretson relayed this information to [Lewis]. [Lewis] agreed to take the twelve ounces. Garretson also told [Lewis] he was meeting Gutierrez at the entertainment complex, but he wanted the two of them to meet [Lewis] at a different location somewhere off of Interstate-10, such as a gas station.

Some time around 8 or 9 p.m., Gutierrez arrived at the entertainment complex and pulled up next to Garretson's car. Gutierrez got into Garretson's car, and the two discussed where they should meet [Lewis]. Garretson then called [Lewis] and told him where they wanted to meet, but [Lewis] told Garretson to stay where he was because [Lewis] was already at the entertainment complex. Garretson and Gutierrez waited, and [Lewis] pulled up in a white car behind Garretson's car, blocking them in. [Lewis] then got into the backseat of Garretson's car behind the driver's seat. As [Lewis] got into the car, he introduced himself to Gutierrez as Cheese, and he asked Gutierrez if the cocaine was raw. Garretson assumed [Lewis] asked if the cocaine was raw because [Lewis] wanted to cook it into crack, and he did not want to ruin it

6

like the first time. Gutierrez told [Lewis] the cocaine was raw and offered [Lewis] a sample of it. Gutierrez then handed the package to [Lewis], and [Lewis] started to unwrap it. At this point, Garretson was looking straight forward, allowing Gutierrez and [Lewis] to take care of their business. The next thing Garretson heard was a shot fired from inside the car. As Garretson turned to see what happened, he saw Gutierrez attempting to get out of the car and run, and then he heard a second shot fired. According to Garretson, Gutierrez never pulled any kind of weapon on [Lewis].

After Gutierrez got out of the car, [Lewis] put the gun to Garretson's head and told him to leave. [Lewis] warned Garretson if he made it look obvious, he would shoot him as well. By this point, the white car [Lewis] arrived in had left the scene, so Garretson was able to back out and leave the entertainment complex. Due to construction, Garretson could not get onto Interstate-10, so he headed west down the feeder road. Garretson overheard [Lewis] tell someone over his cell phone that 'he got him a good one.' As Garretson pulled up to the second stoplight on the feeder road, [Lewis] got out of Garretson's car and jumped into the car behind it. According to Garretson, the other car appeared to continue driving west, but Garretson turned left and pulled into an apartment complex in order to regroup. Out of fear and panic, Garretson decided not to call the police.

Garretson ultimately decided to get rid of his car, so he left it at [Lewis]'s apartment complex with the hope that the police would find it there. Garretson's girlfriend picked Garretson up at the complex and took him back to her apartment. According to Garretson, he never really looked at his car to see if it had any blood in it. It was not until later that evening, after Garretson saw the news, that he discovered Gutierrez had died. Garretson still did not call the police because he was scared of [Lewis]. During the weeks after the shooting, Strawder called Garretson five or six times inquiring into whether Garretson had spoken to the police. During one of those conversations, [Lewis] warned Garretson not to talk to the police. Around the first of March 2006, Garretson had to go to his apartment to pick up some items for school, and when he arrived, Strawder, [Lewis], and three other people were at his apartment. Again, [Lewis] asked if Garretson had gone to the police and warned him '[y]ou wouldn't want me to have to do you like I did Mike.'

On March 8, 2006, Sergeant Guillermo Gonzalez contacted Garretson and asked if he would come to the police station. Garretson met with the police later that day and told them what happened. Garretson also provided the

7

address of where Strawder and [Lewis] were staying. On that same day, Garretson picked [Lewis] out of a photo spread. According to Garretson, he was one hundred percent sure the person in the photo was the person he knew as Cheese and was the person who shot Gutierrez on February 22, 2006. Garretson agreed to testify for the State, and during trial, he provided testimony supporting the above mentioned facts.

Scott McDonald, a youth-worship pastor at Fairmont Park Baptist Church, was at the entertainment complex the night Gutierrez was killed. McDonald testified he was in the parking lot of the Improv Comedy Club, which is located in the entertainment complex, talking to a group of friends when he heard a gunshot. McDonald testified he was sure he heard at least one gunshot, but due to all of the confusion, he was unsure whether there was a second shot fired. As McDonald looked in the direction of the gunshot, he noticed a man stumbling. McDonald testified the man took a couple of steps forward and then violently fell face first onto the concrete. McDonald testified that, as he was rushing toward the man, he called the police. According to McDonald, the man was breathing heavily and struggling by the time McDonald got to him, and by the time the ambulance arrived, the man had died.

Gonzalez, a sergeant with the Houston Police Department, was called to the scene the night of the shooting. Gonzalez testified he did not recover any bullets or a gun from the scene, but he stated the police often do not find a gun at the scene of a crime. During his investigation, a friend of Gutierrez's gave him Garretson's name. Gonzalez testified he tracked Garretson down and asked him to come to the police station. According to Gonzalez, Garretson told him Cheese shot Gutierrez. With this information, Gonzalez determined Cheese was [Lewis]. He then obtained a picture of [Lewis], and had another officer compile a photo spread with [Lewis]'s picture in it. Gonzalez also testified Garretson provided some phone numbers, and with this information, Gonzalez requested the cell phone records for Gutierrez, Strawder, and [Lewis]. According to Gonzalez, the cell phone records showed [Lewis]'s cell phone was in the quadrant of the entertainment complex at the time of the murder. On cross-examination, however, Gonzalez admitted the phone records did not contain the content of the conversations.

Gonzalez also testified he obtained Garretson's car and sent it to the vehicle-exam building for inspection. The inspection revealed there was blood in the front passenger-side door jam[b]; however, Gonzalez learned from

8

Strawder that Strawder had cleaned the car with Clorox before it was discovered. Gonzalez testified [Lewis] knew Strawder had cleaned the car. Gonzalez also testified from his investigation, he did not believe Garretson was involved with the murder other than setting up the drug deal.

Sergeant Norman Kiesewetter of the Houston Police Department testified he was asked to examine Garretson's car for fingerprints and blood sometime in March 2006. Kiesewetter testified he found some blood in the right door jam[b], and he lifted fingerprints from the left-door window in the backseat. Kiesewetter admitted on cross-examination he did not process the car for gun-powder residue. Rafael Saldivar, an officer with the Houston Police Department, testified he performed an analysis on the fingerprints Kiesewetter lifted, and they were not a match for [Lewis]. However, Saldivar testified it was still possible for [Lewis] to have been in the car and not left any fingerprints.

Stephen Wilson of the Harris County Medical Examiner's Office conducted the autopsy on Gutierrez. According to Wilson, the gunpowder found on Gutierrez's undershirt and body suggested Gutierrez was within close proximately [sic] to the shooter. Wilson testified the cause of Gutierre's death was a gunshot wound, and his death was consistent with someone shooting him with a deadly weapon. While Wilson testified Gutierrez's wound was consistent with someone shooting him from the backseat of the car, he also admitted on cross-examination it was possible the shooter was in the front seat of the car.

Lastly, Breck McDaniel, a sergeant with the Houston Police Department, testified regarding his special training in telephone-date investigation. According to McDaniel, by looking at the cell-phone records for a particular number, he could determine an accurate approximate geographic area that the phone was in when the call began and when it ended. McDaniel testified he examined the records for a cell phone registered to [Lewis]. McDaniel testified during the time of the murder, [Lewis]'s phone was located in the area of the murder. According to McDaniel, the next call made from [Lewis]'s phone indicated the phone was heading west on Interstate-10. McDaniel explained that typically a cell phone would use the closest tower, but based on the network traffic, the system sometimes routed a call to a tower further away. McDaniel also testified the records indicated Garretson and [Lewis] called each other back and forth a number of times on the day of the murder. On cross-examination, McDaniel admitted he had no way of telling what person

9

> was actually using the phone at the time of the call, and that people often lost, misplaced, or allowed others to borrow their phones.
>
> [Lewis] did not testify on his own behalf and he did not call any witnesses.

*Lewis*, 2008 WL 2262069, at *1–5.

In rejecting petitioner's challenges to the sufficiency of the evidence, the intermediate state court of appeals held as follows:

> In his first two arguments, appellant argues the evidence is legally and factually insufficient to support the murder conviction. While [Lewis]'s brief included the proper standards of review for legal and factual sufficiency, [Lewis] failed to include any arguments as to how or why the evidence is insufficient. Technically, [Lewis] has waived this complaint on appeal. However, even assuming [Lewis] did not waive his arguments, the evidence is legally and factually sufficient to support his conviction.
>
> *1. Standard of Review*
>
> In a legal sufficiency review, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)[.] The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision.
>
> \* \* \* \*
>
> *2. Analysis*
>
> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). The evidence presented through Garretson's testimony, as detailed in the factual section above, is sufficient to support [Lewis]'s conviction. Garretson testified regarding the events that

> occurred before, during, and after the shooting of Gutierrez. Additionally, Garretson picked [Lewis] out of a photo spread and testified he was one hundred percent sure the person in the photo was the person he knew as Cheese and was the person who shot Gutierrez on February 22, 2006. The testimony of one eyewitness is sufficient to support a jury's verdict. Therefore, Garretson's testimony, standing alone, is sufficient evidence.
>
> Furthermore, the circumstantial evidence presented showed the following: (1) [Lewis] knew the first drug deal between Strawder and Gutierrez went bad; (2) Strawder and [Lewis] were working together in the second drug deal; (3) investigators found blood in the front passenger-side door jam[b] of Garretson's car; (4) Strawder told the police he cleaned the car with Clorox before the police found it; (5) [Lewis] knew Strawder cleaned the car; and (6) [Lewis]'s cell-phone records indicated his cell phone was in the vicinity of the entertainment complex at the time of the murder. Additionally, [Lewis] failed to provide any contrary evidence.
>
> Viewing the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to support [Lewis]'s conviction for murder because any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Lewis*, 2008 WL 2262069 at *7–8 (citations omitted).

Upon federal habeas review, a court may only apply the standard of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 320 (1979). The trier of fact has the responsibility of weighing the evidence, resolving conflicts in testimony, and drawing reasonable inferences from basic facts to ultimate facts. *Id.* A federal habeas court may not substitute its view of the evidence for the fact finder's determination. *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).

11

The intermediate state court of appeals expressly applied this standard in reviewing the evidence in petitioner's case, and rejected his assertions of insufficient evidence in the following factual analysis:

> A review of the record reveals testimony was elicited regarding Garretson's actions before, during, and immediately after the murder as follows: (1) sometime during the middle of February, Strawder contacted Garretson and asked if he could get eight ounces of cocaine; (2) Garretson did not want to help Strawder at first, but Strawder told Garretson he would use the money to get his own apartment; (3) Garretson contacted Gutierrez and asked if he would be interested in selling eight ounces of cocaine; (4) Garretson did not initially tell Strawder he had asked Gutierrez to provide the cocaine; (5) Gutierrez suggested the four men meet at his house, but Garretson did not want to make the exchange there because he did not want Strawder and his friend to know where Gutierrez lived; (6) Garretson decided to meet Gutierrez at the entertainment complex and the two of them would meet Strawder and his friend at a different, less public location to exchange the drugs; (7) [Lewis] called Garretson while he was waiting at the entertainment complex and asked him if he could get sixteen ounces instead of eight; (8) Garretson was surprised when [Lewis] called him, and Garretson wanted to cancel the deal; (9) Garretson would not have set up the deal had he known [Lewis] was involved; (10) Garretson told [Lewis] he was meeting Gutierrez at the entertainment complex but wanted to meet [Lewis] in a different location; (11) [Lewis] told Garretson to stay at the entertainment complex; (12) after [Lewis] fired the shots, he put the gun to Garretson's head, instructed Garretson to leave, and instructed Garretson not to make it obvious or he would shoot him too; (13) after [Lewis] got out of Garretson's car, Garretson took the car to [Lewis]'s apartment complex in hopes the police would find it there; (14) out of fear and panic, Garretson did not call the police; (15) Garretson did not know Gutierrez died until he saw the news later that evening; (16) [Lewis] told Garretson he would kill him if he talked to the police; (17) when approached by the police, Garretson went to the station and provided the police information regarding the murder; and (18) Gonzalez testified that, based on his investigation, he did not believe Garretson was involved with the murder other than setting up the drug deal.

*Id.* at *6.

The jury weighed the testimony and evidence in the case, drew inferences, and ultimately determined petitioner was guilty of murder. This Court will not question the fact finder's determination on these fact specific issues. *See Alexander*, 775 F.2d at 598. In the light most favorable to the prosecution, there was ample evidence from which a rational jury could find beyond a reasonable doubt that petitioner committed the offense of murder as charged. Petitioner fails to provide any evidence to overcome the factual determinations made by the state court, or to demonstrate that the state court's decision was contrary to, or involved the unreasonable application of, federal law. See 28 U.S.C. § 2254(e), (d). Accordingly, petitioner's challenges to the sufficiency of the evidence are without merit.

## IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 687. The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance

was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

### A. <u>Improper Victim Impact Statement</u>

Petitioner claims that trial counsel was ineffective in failing to object to an improper victim impact statement. Specifically, he claims that counsel should have objected to testimony of the complainant's brother during the guilt/innocence phase of trial because the testimony constituted improper victim impact evidence.

In denying habeas relief, the trial court made the following relevant findings of fact:

8. The Court finds based on the court reporter's record that the decedent's brother, Robert Gutierrez, testified during the guilt stage of the applicant's trial.

9. The Court finds based on the court reporter's record that Robert Gutierrez did not provide improper victim impact testimony during the guilt stage of the applicant's trial.

10. The Court finds based on the court reporter's record that [trial counsel] objected to relevance when Robert Gutierrez began to describe the decedent's personality.

11. The Court finds based on the court reporter's record that [trial counsel] also objected to the admission of two photographs of the decedent and the objection was sustained.

*Ex parte Lewis*, Supp. Rec., p. 43 (record cites omitted). The trial court made the following relevant conclusions of law:

1. The applicant fails to show that counsel's conduct fell below an objective standard of reasonableness and that, but for trial counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.

2. The totality of representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Id.*, p. 44 (citations omitted). The Texas Court of Criminal Appeals relied on these findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

The record and findings of fact show that trial counsel objected to the complained-of testimony during the guilt/innocence phase of trial. The trial court additionally found that Gutierrez did not provide improper victim impact testimony during the guilt/innocence phase

15

of trial. Petitioner fails to establish deficient performance under *Strickland*. Even assuming counsel failed to object to purported victim impact testimony, no actual prejudice is established, in that petitioner fails to show that, but for counsel's failure to object, there is a reasonable probability that the result of the trial would have been different.

The state court denied relief on this claim. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

B.     Insufficient Impeachment

Petitioner contends that trial counsel was ineffective for failing "to impeach the credibility of State's witness [Clay Garretson] to [a] greater extent."

In denying habeas relief, the state trial court found that trial counsel was able to establish that Garretson was a drug dealer and that it was likely he was being compensated for his actions in drug dealing; that Garretson was aware of the lingo of drug trafficking; that Garretson was unwilling to go back to the scene of the shooting because he did not want the police to be aware of his role in the drug transaction; and that Garretson never contacted the police after the shooting and that the police contacted him. *Ex parte Lewis*, p. 44.

The trial court further made the following relevant conclusions of law:

1.     The applicant fails to show that counsel's conduct fell below an objective standard of reasonableness and that, but for trial counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.

>    2.   The totality of representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Id.*, p. 44 (citations omitted). The Texas Court of Criminal Appeals relied on these findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

In claiming that trial counsel failed to impeach Garretson "to [a] greater extent," petitioner argues that counsel should have shown that Garretson, too, had been a suspect in the murder offense. This Court is not persuaded. Assuming that Garretson had been a suspect at some early point and that such evidence would have been admissible, petitioner fails to rebut the strong presumption that counsel's actions were not the product of reasoned trial strategy. *West*, 92 F.3d at 1385. Further, petitioner does not show that, but for counsel's failure to pursue such line of questioning, there is a reasonable probability that the result of the trial would have been different. Consequently, petitioner fails to establish either deficient performance or actual prejudice under these circumstances, and ineffective assistance of counsel is not shown.

The state court denied relief on this claim. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

## V. CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 18) is **GRANTED** and this case is **DISMISSED WITH PREJUDICE**. A certificate of appeal ability is **DENIED**. Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the 25th day of August, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE